**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SVANACO, INC.,                             )
                                           )
          Plaintiff,                       )
                                           )          No. 15-cv-11639
     v.                                    )
                                           )          Judge Andrea R. Wood
JONATHAN BRAND and                         )
MARTY GILMAN, INC.,                        )
                                           )
          Defendants.                      )
_____

MARTY GILMAN, INC.,                        )
                                           )
          Counter-Claimant,                )
                                           )
     v.                                    )
                                           )
SVANACO, INC.,                             )
                                           )
          Counter-Defendant.               )

## MEMORANDUM OPINION AND ORDER

This case arises from a soured business relationship between Plaintiff Svanaco, Inc., also

known as Americaneagle.com ("Svanaco"), and Defendant Marty Gilman, Inc. ("MGI").

Svanaco creates, hosts, and maintains business websites. In 2012, MGI, a seller of sports

equipment, retained Svanaco to design and redevelop its website. The parties disagree about

which of them is at fault but do not dispute that by 2015, Svanaco had not delivered a completed

website and MGI had not paid the full balance due under the contract. In October 2015, MGI

retained Defendant Jonathan Brand as an independent consultant and informed him of its dispute

with Svanaco. Over the course of the next few months, Brand launched various attacks against

Svanaco on the internet; for example, Brand created more than a dozen websites with

"americaneagle" in the URL, posted negative reviews about Svanaco on third-party websites, and launched distributed denial-of-service attacks to disrupt traffic on Svanaco's websites.

Svanaco has sued both MGI and Brand[1] pursuant to the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d) (Count I), and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 (Count II), and has also asserted state law claims of defamation (Count III), tortious interference with prospective economic advantage (Count IV), and civil conspiracy (Count VI).[2] In addition, Svanaco has sued MGI for breach of contract (Count VII), and MGI has likewise asserted a counterclaim against Svanaco for breach of contract. Now before the Court are MGI's motion for summary judgment as to Svanaco's claims (Dkt. No. 195-1) and Svanaco's motion for summary judgment as to MGI's counterclaim (Dkt. No. 191). For the reasons explained below, MGI's motion is granted in part and denied in part, and Svanaco's motion is denied.

## BACKGROUND

### *The Parties*

Svanaco is an Illinois corporation that, under the trade name americaneagle.com, creates, hosts, and maintains general and ecommerce websites for businesses and governmental bodies. (MGI's Resp. to Svanaco's Statement of Material Facts ("MGI's RSMF") ¶ 1, Dkt. No. 207.) Svanaco has created websites for clients such as the National Football League Hall of Fame and the Chicago Bears professional football team. (Pl.'s L.R. 56.1(b)(3)(A) Resp. to Def. MGI's L.R. 56.1(a)(3) Statement of Undisputed Material Facts ("Pl.'s RSMF") ¶ 79, Dkt. No. 206.) MGI is a

---

[1] On July 28, 2016, the Court granted Svanaco's motion for entry of default as to Brand.

[2] The Amended Complaint also included a claim under the Illinois Computer Tampering Act, 720 ILCS § 5/17-51, as Count V, which Svanaco voluntarily dismissed. (Dkt. No. 125.)

Connecticut corporation that, under the trade name Gilman Gear, sells sports equipment and related products. (MGI's RSMF ¶ 2.) In 2012, Svanaco and MGI entered into a contract ("Agreement") under which Svanaco would design and redevelop MGI's website for $50,000. (*Id.* ¶¶ 7–8.) Under the terms of the Agreement, MGI would pay Svanaco in three equal payments: the first payment of $16,667 was due at the time of signing, the second payment was due upon completion of the Project Plan and Graphics, and the final payment would be due upon launch of the website. (*Id.* ¶ 8; *see also* MGI's RSMF Ex. 8.) MGI made the first two payments to Svanaco, but the parties came to a serious disagreement before MGI submitted the third payment. (MGI's RSMF ¶ 9.)

### *The Contract Dispute*

To complete the website, Svanaco required certain product information from MGI, such as the pricing, color options, and stock keeping unit ("SKU") numbers of MGI's products. (*Id.* ¶¶ 13, 31.) But MGI never provided a completed spreadsheet of this information to Svanaco as requested. (*Id.* ¶¶ 28–30.) The parties disagree about who is responsible for MGI's failure to provide the information to Svanaco. According to Svanaco, it is standard practice for the customer to provide such information, but MGI repeatedly refused to do so despite multiple requests and reminders, causing a significant delay. (*Id.* ¶ 15.) However, according to MGI, Svanaco was responsible for devoting 55 hours to importing product information to the website or otherwise helping MGI with this task but only spent 6.5 hours doing so. (*Id.* ¶¶ 16, 24–25; Pl.'s RSMF ¶ 11.) Svanaco, in turn, claims its staff spent almost 55 hours on related tasks such as creating the product information spreadsheet, training MGI's staff to use the spreadsheet, and building an import tool that allowed MGI to import the data directly into the website. (Pl.'s RSMF ¶ 11.)

On June 30, 2014, Svanaco presented a "beta website for testing and training" to MGI. (MGI's RSMF ¶ 32.) Svanaco claims it had completed all programming work for MGI's website by then, and MGI could fully test the website's functionality through the beta website. (*Id.* ¶ 38.) Svanaco also claims the website contained a product import tool that would allow MGI to import its product information without further assistance by Svanaco. (*Id.* ¶¶ 36–37.) By contrast, MGI claims the beta website was incomplete and had multiple issues; for example, it did not link to MGI's Facebook page or Twitter, was missing the home page with welcome text and audio, and had no company profile page, no banner ads for the various categories of equipment, and no subpages. (*Id.* ¶ 32.) Thus, according to MGI, the website could not be tested or evaluated in any meaningful way. (*Id.* ¶ 37.) Svanaco also sent MGI an invoice for the third and final payment around the same time it provided the beta website, which MGI did not pay. (Pl.'s RSMF ¶ 23.) MGI accuses Svanaco of attempting to use the beta website to obtain the third and final payment from MGI, with no intention of completing the website. (*Id.* ¶ 22.)

On May 8, 2015, Svanaco sought payment of $8,666.66 to resume work on the website and told MGI that payment was due within 30 days of the beta website delivery. (*Id.* ¶ 27.) Then, on May 18, 2015, Svanaco requested payment of $8,000 to "continue work on this project," informing MGI that it had spent over 700 hours working on the website. (*Id.*) MGI refused to pay, and in June 2015, Neil Gilman, MGI's CEO, stated that he would "post [the beta website] online and invite comment from people who are expert [*sic*] in web development." (*Id.* ¶ 28.)

### *MGI Hires Jonathan Brand*

In October 2015, Gilman posted various public advertisements seeking a web designer. (*Id.* ¶ 30.) On October 11, 2015, Brand contacted Gilman via email. (*Id.*) Brand and Gilman had never met or had any contact prior to this point. (*Id.* ¶ 31.) On October 13, 2015, Gilman

interviewed Brand and offered him $900. (*Id.*) According to MGI, Gilman hired Brand as an independent consultant to review the beta website and determine whether it reflected 700 hours of work. (*Id.*) Gilman did not hire Brand as an employee nor did Gilman provide him with any equipment. (*Id.* ¶¶ 56–57.) Gilman gave Brand a copy of Svanaco's business proposal and several emails containing passwords and links to access the beta website. (*Id.* ¶ 32.) After Brand accessed the beta website, he told Gilman that based on what he had seen, it would be difficult for Svanaco to argue that it had worked for more than 5–10 hours on it. (*Id.* ¶ 33.)

Gilman asked Brand if Svanaco could be "shamed" into repaying his money. (*Id.* ¶ 34.) According to MGI, Gilman meant (and Brand understood him to mean) that Svanaco would be presented with "truthful statements" about how little time had been spent on the beta website. (*Id.* ¶ 34.) Brand replied, "yes, they can be shamed," and sent Gilman a link to a website Brand had created, americaneaglereviews.com. (MGI's Resp. to Svanaco's L.R. 56.1(b)(3)(A) Statement of Additional Facts ("MGI's RSAF") ¶ 9, Dkt. No. 220.) Brand also invited Gilman to make "comments/edits" to his website. (*Id.* ¶ 11.) MGI claims Gilman did not click the link but does not dispute that he later asked Brand, "has this gone live yet? Why is it that American Eagle hasn't reached out to me if this is on the web?" and "Are they [Svanaco] aware of your review?" (*Id.* ¶ 12.)

On October 28, 2015, Brand met with Gilman and MGI's financial administrator, Nadine Parker, to "go over [his] work" and obtain the $900 payment. (Pl.'s RSMF ¶ 35.) Brand did not receive any other payment from MGI after this point. (*Id.* ¶ 36.) At the meeting, Brand talked about posting an online review about Svanaco. (*Id.* ¶ 37.) Parker told Brand this would be acceptable "as long as it is truthful." (*Id.* ¶ 37.) That evening, Gilman reviewed Brand's post and told him to "make it very clear exactly what [Svanaco] put up which they think is a Beta Site,"

and include a title "something like 700 hours of AE done in 30 minutes using Word Press." (*Id.* ¶ 38.) Gilman also stated in his email to Brand, "The big point is that AE didn't do any work for us. Just minimal design concept stuff. I am concerned that AE won't feel intimidated by this review." (*Id.*) The parties dispute whether Brand incorporated Gilman's edits. (*Id.* ¶ 39.)

The following week, Brand sent Gilman a series of emails urging Gilman to write a demand letter to Svanaco and aggressively seek a refund. (*Id.* ¶ 40.) Brand also sent Gilman a proposed letter he drafted for Gilman to send to Svanaco, which stated, "My [Gilman's] understanding is that squaring up with Gilman Gear as soon as possible, you may see my consultant's personal warning website taken offline, rather than see it strengthened through aggressive social media and backlink campaigns." (*Id.* ¶ 43.) In another email to Gilman, Brand voiced his intent to damage Svanaco financially to the tune of "$100k – 500k in the first 7–9 months." (*Id.*) In addition, Brand told Gilman in the emails that "this happened to many other people," encouraged Gilman to read negative reviews of Svanaco that Brand had summarized, recommended that Gilman file a Better Business Bureau ("BBB") complaint against Svanaco, and asked Gilman to pay money to boost Brand's negative review website, americaneaglewebreviews.com, to the top of search-engine listings. (*Id.* ¶ 40.) Gilman claims he did not take any of the actions that Brand suggested and did not know Brand had filed a BBB complaint purporting to be from MGI. (*Id.* ¶ 41.) By contrast, Svanaco claims Gilman thanked Brand for filing the BBB complaint in his name and did not withdraw it. (*Id.*) Gilman also sent an email to Brand on November 1, 2015, asking "Is now the time to contact them and ask them to refund our money?" (*Id.* ¶ 43.)

Brand also took other steps to post negative content on the internet about Svanaco. He registered more than a dozen websites with the phrase "americaneagle" (or some variation or

misspelling of the phrase) in the URL, such as "Americaneaglereviews.com," "Americaneaglewebreviews.com," "Americaneaglewebdesign.com," "Ameriacaneagle.com," and "Ameriecaneagle.com." (*Id.* ¶ 47.) On these newly created sites, Brand made negative statements about Svanaco, including "our developer above caught up to American Eagle's two years of work in 30 minutes and had the beta website handling product variations and pricing in 3 hrs.," "they walked with the $34,000, no arrests made to date but what is clear is that the design work never started beyond one roughly ½ hour task and that two years of slick Eagle talk," and "American Eagle's Manhattan offices appear to have used a combination of radio ads, proprietary jargon and contractual falsehoods to bill $34,000 for less than 6 hours of actual web services." (*Id.* ¶ 44; MGI's RASF ¶ 34.) Brand also called Svanaco an "incurious and overconfident high-end web scam," a "web contract fraud ring," and a "fraud." (*Id.* ¶¶ 34–35.) Posing as actual clients of Svanaco, Brand published these fake negative reviews both on the websites he himself created and on third-party websites such as Glassdoor.com, SiteJabber.com, and Yelp.com,[3] as well as on social media sites such as Twitter. (Pl.'s RSMF ¶¶ 46–47.) Furthermore, Brand posted online content personally attacking Svanaco's lawyers, Robert Reda and Robinson Curley. (*Id.* ¶ 51.)

Brand sent links to his posts to Gilman, although the parties dispute whether Brand did so with Gilman's knowledge and approval. At his deposition in this matter, Brand testified that although he sent links, he did not think Gilman understood what was going on. (*Id.* ¶ 50.) The parties also dispute whether Brand posted the content alone or with the help of an online group called "Anonymous." (*Id.* ¶ 45.)

---

[3] On December 21, 2015, Brand sent Gilman links to posts on SiteJabber.com and Yelp.com, and Gilman responded that he would review them. (MGI's RASF ¶ 23.) MGI claims that when Gilman reviewed the links, he believed the posts had been written by actual Svanaco customers. (*Id.*)

### *Svanaco is Attacked*

On November 18, 2015, Svanaco was targeted by a distributed denial-of-service ("DDOS") attack, which resulted in a 25-minute disruption of service for some websites hosted by Svanaco. (*Id.* ¶ 70.) The parties dispute whether Brand instigated the attack on November 18, 2015.[4] Svanaco claims it suffered damages from the attack in the form of 85 hours of employee time; specifically time that its employees Ryan McElrath, Tony Svanascini, and Michael Svanascini expended in responding to the attack and repairing the resulting damage.[5] (*Id.* ¶ 73.) Moreover, on November 27, 2015, the website of one of Svanaco's attorneys, Robert Reda, was targeted by a DDOS attack. (*Id.* ¶ 71.) The attack was unsuccessful and did not result in a disruption of service. (*Id.*) According to McElrath, whom Svanaco has designated as an expert witness,[6] Brand was responsible for the DDOS attack on Reda's website. (*Id.*)

Svanaco also claims that on November 18, 2015 Brand initiated three separate live-chat sessions with Svanaco referencing Gilman Gear, suggesting that Svanaco "square up" with MGI and threatening to "attack" Svanaco and its "brand in web search," as well as its "existing clients." (Pl.'s RSMF Ex. SS.) MGI disputes that Brand initiated those live-chat sessions. (Def.'s RSMF ¶ 17.)

---

[4] Svanaco's expert witness, Ryan McElrath, was unable to conclude that Brand was responsible. But Svanaco points out that on the same morning, November 18, 2015, Brand advised Gilman to "expect a call by Thursday of this week." (Pl.'s RSMF ¶ 70.)

[5] Svanaco values the 85 hours as worth $17,141.

[6] MGI argues McElrath's report should be stricken because it is unsworn. (Def./Counter-Pl. MGI's Mot. to Strike ("MGI's MTS") at 2, Dkt. No. 221.) However, in evaluating a motion for summary judgment, the Court may consider "any evidence that would be admissible at trial," even if it is not admissible in its current form. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). Moreover, Federal Rule of Civil Procedure 26(a)(2)(B) only requires a witness report to be **signed**—not sworn—and the Court observes that McElrath indeed signed his report. (Pl.'s RSMF Ex. F.) Therefore, the Court denies MGI's motion to strike McElrath's report.

*NiSource, Calico Cottage, and ID Systems*

According to Svanaco, three potential customers ultimately decided not to do business with Svanaco after discovering Brand's postings and websites: NiSource, Calico Cottage, and ID Systems. (Pl.'s RSMF ¶ 78.) NiSource representative Theodore Markiewicz testified at his deposition that the night before NiSource met with Svanaco, one of Markiewicz's team members sent him a website with negative information about Svanaco and its "success with clients in terms of providing deliverables and completing the project." (Pl.'s RSMF Ex. Y at 34.) Markiewicz could not recall specifically whether he saw any of Brand's websites or any reviews mentioning MGI. (*Id.*) Nonetheless, Markiewicz felt "concern[ed]" about the "negative information" he had read, which "made [him] pause to determine if [NiSource] should interview the company." (*Id.* at 36.) At the meeting between NiSource and Svanaco, Markiewicz summarized the negative online content and expressed that it made him "very concerned about building a relationship" with Svanaco. (*Id.* 41.) Despite Markiewicz's concerns, after the meeting, NiSource invited Svanaco to submit a bid for its business. (MGI's RSAF Ex. 59.) NiSource did not reject Svanaco's bid until several months later, after conducting "rankings and ratings" of the bidders based on criteria "across many different categories." (*Id.*)

Judy Levin, Calico Cottage's Director of Marketing, stated that in April 2016, she mentioned in a phone conversation with Gareth Roberts, a regional director for Svanaco, that she had read a negative online customer review of Svanaco. (MGI's R. 56.1(a)(3) St. of Undisputed Mat. Facts ("MGI's SUMF") Ex. 45, Dkt. No. 196-7.) However, Levin did not recall any details about the review, such as who authored it or any of its content, "other than it appeared to be a generic complaint." (*Id.*) Similarly, Richard Garten, President of ID Systems, confirmed that he had viewed negative online comments about Svanaco. (MGI's SUMF Ex. 46.) Garten also stated

that he emailed Laura Jackimec, a Svanaco employee, informing her that "one of the primary reasons that ID Systems decided not to go with [Svanaco] was because of various negative reviews that were posted online." (*Id.*)

Yet both Levin and Garten swore affidavits insisting that their respective companies did not base their decisions not to hire Svanaco on the negative online reviews. (Pl.'s RSMF ¶¶ 78.) Instead, Levin stated that her company declined Svanaco's business proposal for three reasons: "(1) we wanted to retain a company that was more conveniently located and more accessible for onsite meetings; and (2) [Svanaco] was not an expert in the content management system (CMS) that we use at Calico Cottage[; and] (3) we wanted to retain [a] company whose scale was more similar to ours." (MGI's SUMF Ex. 45.) Levin also sent an email to Svanaco explaining that Calico Cottage "just didn't feel it was a good fit based on the size of company we would like to work with and proximity to our offices." (*Id.*)

Garten, for his part, stated that his email to Jackimec was untruthful, and "the reason that I listed the negative reviews as a reason for choosing another website company was to stop the sales pitches from [Svanaco] so I could move on with running my company." (MGI's SUMF Ex. 46.) According to Garten, he had previously informed a female representative of Svanaco that its business proposal was too expensive, but Svanaco nonetheless made "multiple attempts . . . to close a sale with ID Systems." (*Id.*) Garten added, "I can honestly state that even if all of the reviews that I may have read about [Svanaco] were positive, I still would not have entered into an agreement with [Svanaco] to build a website for ID Systems due to their pricing and ID Systems' budget." (*Id.*)

*Svanaco's Counsel Contacts MGI and Brand*

On November 24, 2015, Gilman received a letter from Reda identifying numerous allegedly defamatory and unlawful websites and YouTube videos. (Pl.'s RSMF ¶ 62.) Gilman then sent a series of emails to Brand in late November and December 2015, urging Brand to call him, take down previously-posted content and stop posting additional content, and "ask your network in the dark web to take [the content] down now." (*Id.* ¶ 64.) Brand replied, "I'll do exactly as you ask." (*Id.* ¶ 65.) Brand testified that after Gilman asked him to stop, he refrained from creating any additional posts and "contacted Anonymous" to try and remove other websites and posts. (*Id.*) But Brand or Anonymous[7] continued to post websites, reviews, and other content about Svanaco, its counsel, and its employees through 2016. (*Id.* ¶ 66.) And during an in-court appearance on December 23, 2016, Brand provided login and password information that allowed Svanaco to remove additional postings and websites. (*Id.* ¶ 65; Pl.'s RSMF Ex. X.)

Brand also advised Gilman, "Please send this basic form of reply to Mr. Reda, the attorney asap. [*sic*] 1. What does this content have to do with me? I see content relating to my business but I did not publish it. 2. I am not familiar with this content nor do I know exactly how it was obtained. 3. If I can be of further assistance, please let me know." (MGI's RSAF ¶ 18.) Brand sent another email to Gilman a few minutes later, stating:

> For right now, forward all communication to me when you receive it and before you send it. That ensures nothing goes outside of plan . . . . At the beginning part of this process, don't answer a single question about me. This forces disclosure of exactly why [*sic*] they have and how. All completely routine, I have done this before.

---

[7] According to Brand, he was powerless to stop Anonymous from continuing to post new content. (Pl.'s RSMF ¶ 65.) But according to Svanaco, Anonymous played no role, and Brand alone created all the websites and posts. (*Id.*)

(*Id.*) Gilman replied, "Yes, I will send you any communication before it is sent to AE [American Eagle]. Of course, I will not answer any question [*sic*] about you." (*Id.*) The following week, on December 1, 2015, Gilman sent an email to Reda stating, "I really don't know what you are referring to. Perhaps you could send me a link to what you are referring to because I have not seen it. I have no knowledge of what it contains." (*Id.* ¶ 19.) The first two paragraphs of this email were suggested by Brand; Gilman authored the last sentence. (*Id.*) Gilman then forwarded to Brand a copy of his email to Reda. (*Id.*) Gilman later asked Brand to respond to another communication from Reda, and Brand told Gilman that he had done so. (*Id.* ¶ 20.) Then, on December 19, 2015, Gilman asked Brand to send Reda a statement to the effect that MGI was not involved in the creation and posting of the reviews and websites. (*Id.* ¶ 21.) Gilman explained, "I need this to protect myself from all the threats being made by Reda and American Eagle." (*Id.*)

In January 2016, Gilman told Brand that he could submit a proposal to build a new e-commerce website for MGI. (*Id.* ¶ 24.) According to MGI, Brand was "desperate for money," even going so far as offering to "sweep floors" for MGI, and Gilman allowed Brand to submit a proposal out of pity. (*Id.*) MGI eventually declined to retain Brand for that purpose. (*Id.*) On January 27, 2016, Brand sent an email to Parker, MGI's financial administrator, stating, "I finished the side project months ago as agreed so that we could return to the reason I interviewed, to have a website proposal considered." (*Id.* ¶ 28.) However, Gilman eventually told Brand that he did not intend to hire him to build a website for MGI. (*Id.*; MGI's SUMF Ex. 37.)

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). Summary judgment will be denied if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, a nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

The arguments raised in the pending cross-motions for summary judgment largely overlap—especially regarding the issue of whether Svanaco and MGI's contract was breached and if so, by whom. Regarding the parties' factual contentions, the Court adopts "a dual, Janus-like perspective" on cross motions aimed at the same claim or defense. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015) (internal quotation marks omitted). On one motion, the Court views the facts and inferences in the light most favorable to the nonmovant, but if summary judgment is not warranted, the Court gives the unsuccessful movant "all of the favorable factual inferences that it has just given to the movant's opponent." *Id.*; *see, e.g.*, *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 997–98 (N.D. Ill. 2017) (evaluating opposing parties' cross motions for summary judgment).

As discussed below, the Court grants MGI summary judgment on Count I (the ACPA claim) and Count II (the CFAA claim) because, even if Brand violated those statutes, Svanaco has not introduced evidence suggesting that it would be appropriate to hold MGI vicariously liable for Brand's actions. The Court denies MGI's motion for summary judgment, however, on Count III (defamation), Count IV (tortious interference), Count VI (civil conspiracy), and Count VII (breach of contract) because Svanaco has created genuine issues of material fact on each

claim. And the Court denies Svanaco's motion for summary judgment on its counterclaim for breach of contract.

## I.   Anticybersquatting Consumer Protection Act (Count I)

In Count I of its Complaint, Svanaco asserts a claim under the ACPA, 15 U.S.C. § 1125(d). The ACPA provides a remedy to victims of "cybersquatting," which has been defined as "the bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another." *Vulcan Golf, LLC v. Google, Inc.*, 726 F. Supp. 2d 911, 915 (N.D. Ill. 2010) (internal quotation marks omitted). The relevant portion of the ACPA provides:

> (1) (A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—
>
> > (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> >
> > (ii) registers, traffics in, or uses a domain name that . . .
> >
> > > (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36 . . .
>
> (D) A person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.

15 U.S.C. § 1125(d)(1).

To establish a claim under the ACPA, a plaintiff must prove that "(1) it had a distinctive or famous mark at the time the domain name was registered, (2) the defendant registered, trafficked in, or used a domain name that is identical or confusingly similar to the plaintiff's mark, and (3) the defendant had a bad faith intent to profit from that mark." *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 914 (N.D. Ill. 2007).

MGI does not dispute that Svanaco had a protected mark, "Americaneagle.com," but nonetheless argues that Brand's websites were not identical or confusingly similar to Svanaco's

mark because several of them contained the word "reviews" in the URL. MGI argues this

distinction "made it clear they were offering critique or evaluation," and "[n]o reasonable viewer

would assume Svanaco was critiquing its own services." (MGI's Reply in Support of Mot. for

Summ. J. at 8, Dkt. No. 226.) In fact, while some of Brand's domain names contained the word

"reviews," such as "Americaneaglereviews.com," the majority did not. For example, Brand

registered the domain names "Ameriacaneagle.com" and "Ameriecaneagle.com," which are

subtle misspellings of Svanaco's mark, as well as the domain names

"Americaneaglewebdesign.net," "Americaneaglewebsitedesign.com,"

"Americaneaglewebdesign.com," and "Americaneaglewebdesigns.com," which combine

Svanaco's mark with the service it provides. (Pl.'s RSMF ¶ 47.) Accordingly, the Court finds

that a reasonable jury could find that Brand registered domain names that were identical or

confusingly similar to Americaneagle.com.

MGI also argues that Brand did not have a "bad faith intent to profit" from his use of that phrase. The ACPA sets forth nine factors[8] that a court may consider in determining whether the defendant had the requisite bad-faith intent. *See* 15 U.S.C. § 1125(d)(1)(B)(i). MGI concedes the first three factors weigh in favor of Svanaco, and the Court agrees. (*See* Def. MGI's Mem. of Law in Support of Mot. for Summ. J. ("Def.'s MSJ") at 12, Dkt. No. 195-2.) First, Brand had no trademark or other intellectual property rights in the domain names. Second, the domain names that Brand registered included Svanaco's trade name or a misspelled version of it. (Pl.'s RSMF

---

[8] The nine factors are as follows:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (V) the person's intent to divert consumers from the mark owner's online location accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as the source, sponsorship, affiliation, or endorsement of the site;
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of [the Act].

18 U.S.C. § 1125(d)(1)(B)(i).

¶ 47). Third, Brand never previously used the domain names in connection with the bona fide offering of any goods or services.

MGI argues that the fourth factor—"bona fide noncommercial or fair use of the mark"—cuts in its favor, as Brand registered the websites not to deceive consumers into making purchases but rather to complain about Svanaco's conduct. It is correct that the ACPA was not intended to prevent the publication of genuine "parody, comment, criticism," and other legitimate exercises of one's First Amendment rights. S. Rep. 106–140, at *8 (1999); *see, e.g.*, *Lamparello v. Falwell*, 420 F.3d 309, 318–20 (4th Cir. 2005) (no liability where defendant created website with celebrity-plaintiff's misspelled name in URL to criticize his expressed beliefs); *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809–10 (6th Cir. 2004) (no liability where defendant created website with plaintiff-company's name in URL to express her displeasure with its services). But a defendant who uses a website's noncommercial design to disguise his bad-faith intent may still be subject to liability under the ACPA. *See, e.g.*, *Toronto-Dominion Bank v. Karpachev*, 188 F. Supp. 2d 110, 114 (D. Mass. 2002); *Flentye*, 485 F. Supp. 2d at 915.

Here, the record contains sufficient evidence from which a jury could find that Brand registered the websites not merely for comment and criticism but also for financial gain. For example, on October 22, 2015, Gilman asked Brand whether Svanaco could be "shamed" into repaying his money, and Brand responded by sending him a link to Americaneaglereviews.com. (Pl.'s RSMF ¶ 34.) Over the next five months, Brand registered twelve additional websites that similarly displayed negative content about Svanaco. (*Id.* ¶ 47.) Brand also repeatedly stated that he expected Svanaco to issue a refund to MGI based on the negative online content and encouraged Gilman aggressively to seek a refund. (*Id.* ¶¶ 41–43.) Brand even drafted a letter

addressed from Gilman to Svanaco, which stated that if Svanaco issued a refund to Gilman, Brand's websites would be taken down and threatened that if Svanaco did not do so, the websites would be "strengthened through aggressive social media and backlink campaigns." (*Id.* ¶ 40.) Furthermore, Brand was paid for his services on MGI's behalf, and the record contains evidence that his services included damaging Svanaco's reputation as revenge for their treatment of MGI. Based on these statements, a reasonable jury could find that the websites did not represent a "bona fide noncommercial or fair use" of Svanaco's mark but rather an intent to induce payment from Svanaco.

The facts in *Toronto-Dominion Bank v. Karpachev*, a case decided by another district court, are analogous to those at hand. 188 F. Supp. 2d at 110. There, the defendant, a disgruntled customer, claimed that the plaintiff caused him to incur a $35,000 loss. *Id.* at 111. As an act of revenge, the defendant registered sixteen domain names composed of variant misspellings of the plaintiff's name. *Id.* On the websites, the defendant accused the plaintiff of "webfascism," "white collar crime," and acting like "Nazi or Soviet Totalitariasts," and encouraged readers to write to the court expressing "what you feel and think about [the plaintiff]." *Id.* at 112. Even though the defendant's website was noncommercial in design, the court did not hesitate to find that he had a bad-faith intent to profit. *Id.* at 114 (denying defendant's motion for summary judgment); *see also Flentye*, 485 F. Supp. 2d at 915 (rejecting defendant's argument that he cannot be held liable under the ACPA because his websites "concern a personal dispute, rather than a commercial dispute"). In the same way, the Court recognizes that Brand may have exhibited a bad-faith intent to profit by targeting Svanaco.

The fifth factor also weighs in Svanaco's favor, as evidence in the record suggests that Brand sought to "divert consumers" from Svanaco's actual website with "the intent to tarnish or

disparage" Svanaco's name and reputation. While MGI argues that no reasonable internet user would believe that Brand's websites were sponsored by Svanaco, Brand's conduct demonstrates that he intended to confuse, mislead, and divert internet users into accessing his websites. For example, the domain names themselves provide evidence of his intent: as explained above, Brand intentionally chose domain names that are subtle misspellings of Americaneagle.com or that combine Svanaco's trade name with the service it provides. *See, e.g.*, *People for Ethical Treatment of Animals, Inc. v. Doughney*, 113 F. Supp. 2d 915, 920 (E.D. Va. 2000) (finding that although it was clear that the defendant's website promoting "People Eating Tasty Animals" was not operated by the plaintiff, People for the Ethical Treatment of Animals, the defendant "clearly intended to confuse, mislead and divert internet users into accessing his web site" PETA.org), *aff'd*, 263 F.3d 359 (4th Cir. 2001). Factor seven—"provision of material and misleading false contact information when applying for the registration of the domain name"—also suggests bad faith, as Brand used random contact information instead of his own when registering the websites, and his "prior conduct indicat[es] a pattern" of similar behavior. (*See* MGI's RSMF ¶ 18 ("All completely routine, I have done this before.").)

The ninth factor, which inquires into the "extent to which the mark incorporated in the person's domain name registration is . . . distinctive and famous within the meaning of [the ACPA]," weighs in Svanaco's favor as well. As a preliminary matter, MGI offers no support or reasoning for its argument that Svanaco's mark is insufficiently distinctive and famous. But regardless, MGI concedes that Svanaco registered its mark, a factor to be considered in evaluating the mark's fame. *See* 15 U.S.C. § 1125(c)(2)(A). And Svanaco's mark is distinct in the sense that it has "no logical association with the product." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000) ("The strongest protection [with respect to

distinctiveness] is reserved for marks that are purely the product of imagination and have no logical association with the product.").

Factors six and eight weigh in favor of MGI and Brand. As to the sixth factor, there is no evidence that Brand offered to "transfer, sell, or otherwise assign" the domain names he registered to Svanaco "for financial gain without having used, or having an intent to use, the domain name." 15 U.S.C. § 1125(d)(1)(B)(i)(VI). Instead, Brand offered to remove the websites entirely if Svanaco offered payment. Similarly, the eighth factor—the registration of multiple other famous domain names at the same time—is not present here, as Brand targeted only Svanaco during the relevant time period. *Id.* § 1125(d)(1)(B)(i)(VIII).

Ultimately, a plaintiff need not prove all nine factors, and the Court "is not limited to considering these nine factors when determining the presence or absence of bad faith." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 268 (4th Cir. 2001); *see also Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 499 (2d Cir. 2000) (same). Rather, "the most important grounds for finding bad faith are the unique circumstances of th[e] case." *Virtual Works*, 238 F.3d at 268 (internal quotation marks omitted). In this case, seven of the nine factors under the ACPA weigh in Svanaco's favor. And although Brand's conduct was somewhat different from that of a typical cybersquatter in that his ultimate goal was not to sell domain names to Svanaco, the record contains ample evidence of Brand's bad-faith intent when registering the websites. Accordingly, MGI is not entitled to summary judgment as to Count I on this basis.

MGI also argues that, in this case, liability under the ACPA is limited to Brand, as § 1125(d)(1)(D) limits liability to the "domain registrant or that registrant's authorized licensee." But courts in this District have consistently held that a plaintiff may pursue an ACPA claim

under a veil-piercing theory. *See, e.g.*, *Flentye*, 485 F. Supp. 2d at 914. To pierce the veil to reach MGI, Svanaco must satisfy a two-pronged test: "(1) there must be such unity of interest and ownership that the separate personalities of [MGI and Brand] no longer exist; and (2) circumstances must be such that adherence to the fiction of separate . . . existence would sanction a fraud or promote injustice." *Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751–52 (7th Cir. 2012) (applying Illinois law) (internal quotation marks omitted). Here, the Court finds that no reasonable jury would pierce the veil and hold MGI responsible for Brand's conduct. The evidence illustrates that on multiple occasions, Brand acted independently or took unsolicited action; for example, Brand testified that although he sent links of his postings to Gilman, he did not think Gilman understood what was going on. *See Flentye*, 485 F. Supp. 2d at 913 (holding that veil piercing must be based on "factual manifestations suggesting . . . that the two operate as a single entity" (internal quotation marks omitted)). The Court finds no evidence in the record that Brand operated as MGI's "alter ego." *Id*. at 912.

In summary, because the Court finds that Svanaco cannot proceed against MGI for Brand's registrations under a veil-piercing theory of liability, the Court grants MGI's motion for summary judgment as to Count I.

## II.     Computer Fraud and Abuse Act (Count II)

In Count II, Svanaco asserts a claim against MGI and Brand pursuant to the CFAA, 18 U.S.C. § 1030. The CFAA is primarily a criminal statute, but it provides a civil remedy as well. *See Fidlar Techs. v. LPA Real Estate Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016). A plaintiff asserting a claim under the CFAA must prove: "(1) damage or loss; (2) caused by (3) a violation of one of the substantive provisions set forth in § 1030(a), and (4) conduct involving one of the factors of harm set forth in § 1030(c)(4)(A)(i)(I)–(IV)." *Segerdahl Corp. v. Ferruzza*,

No. 17-cv-3015, 2019 WL 77426, at *4 (N.D. Ill. Jan. 2, 2019) (internal quotation marks

omitted). The factors of harm given in the statute are as follows: (I) a $5,000 loss during any

one-year period, (II) the modification or impairment of the medical examination, diagnosis,

treatment, or care of one or more individuals, (III) physical injury to any person, and (IV) a

threat to public health or safety. § 1030(c)(4)(A)(i)(I)–(IV).

According to Svanaco, Brand launched DDOS attacks against its websites in violation of

§ 1030(a)(5), which prohibits the "knowing[] . . . transmission of a program, information, code,

or command . . . intentionally caus[ing] damage without authorization, to a protected computer."

MGI does not dispute that the DDOS attacks violated the CFAA but argues that it is entitled to

summary judgment because Svanaco cannot show that it suffered a $5,000 loss, or any of the

other factors of harm under § 1030(c)(4)(A)(i). The CFAA defines "loss" as:

> [A]ny reasonable cost to any victim, including the cost of responding to an
> offense, conducting a damage assessment, and restoring the data, program,
> system, or information to its condition prior to the offenses, and any revenue lost,
> cost incurred, or other consequential damages incurred because of interruption of
> service.

18 U.S.C. § 1030(e)(11). Svanaco has offered evidence that, at a minimum, it lost 85 hours of

employee time responding to the DDOS attacks, which it values as worth $17,141.[9] This amount

obviously exceeds the $5,000 minimum. While MGI points out that the Svanaco employees who

spent time responding to the attacks are salaried employees, wasted or diverted employee time

falls squarely under the CFAA's definition of loss. *See, e.g.*, *Facebook, Inc. v. Power Ventures,*

*Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016) ("It is undisputed that Facebook employees spent many

hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to

---

[9] This is not to say that Svanaco's damages under the CFAA are limited to this $17,141 but merely that a
reasonable jury could find that the $5,000 threshold has been exceeded.

[defendant]'s actions. Accordingly, Facebook suffered a loss under the CFAA."); *United States v. Millot*, 433 F.3d 1057, 1061 (8th Cir. 2006) (holding that salaried employees' time qualifies as a loss under the CFAA because "the hours spent by [employees] addressing the issues caused by [defendant]'s unauthorized intrusion could have been spent on other duties under the contract"). The Court is similarly unpersuaded by MGI's argument that Svanaco's employees spent their time on unrelated tasks; such disputes of fact should be decided by the factfinder at trial, not by the Court at the summary judgment stage. *See United States v. Middleton*, 231 F.3d 1207, 1214 (9th Cir. 2000) ("[W]hether the amount of time spent by the employees and their imputed hourly rates were reasonable for the repair tasks that they performed are questions to be answered by the trier of fact.").

Svanaco also argues that Brand's live-chat conversations violated § 1030(a)(7)(A) of the CFAA, which provides for liability against anyone who "with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to cause damage to a protected computer." However, the Court's review of the live-chat conversations reveal no threat to damage Svanaco's ***computers***. Rather, Brand (or whomever contacted Svanaco through the live-chat if, as MGI claims, it was not Brand) threatened an "attack" in the form of "15 new domains/unique IPs with SSL assisted by 200 social media accounts and back links [that] will ***target your brand in web search*.**" (Pl.'s RSMF Ex. SS (emphasis added).) In other words, through the live-chat function, Brand at most threatened to damage Svanaco's ***online reputation***, which § 1030(a)(7)(A) of the CFAA does not prohibit. Moreover, Svanaco has not provided evidence that the live-chats caused any of the four factors of harm set forth in § 1030(c)(4)(A)(i). Therefore, to the extent that Count II is based on the live-chat conversations on November 18, 2015, Svanaco cannot proceed on such a theory.

Finally, MGI argues that the CFAA does not authorize secondary liability, limiting Svanaco to seeking redress from Brand. Indeed, while § 1030(b) expressly establishes criminal liability for conspiracy to violate the CFAA, the Act is silent as to secondary liability in civil actions. And the Seventh Circuit has yet to address this issue. However, other courts have consistently permitted plaintiffs to assert claims under the CFAA through vicarious liability. *See, e.g.*, *Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 671 (E.D. Pa. 2018) ("A person who did not directly access the computer may still be liable under the CFAA if he directs, encourages or induces someone else to access a computer that he himself is unauthorized to access." (internal quotation marks omitted)); *SBM Site Servs., LLC v. Garrett*, No. 10-cv-00385-WJM-BNB, 2012 WL 628619, at *6 (D. Colo. Feb. 27, 2012) (same). And here, this Court finds the court's analysis in *Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 WL 2369815, at *5–7 (N.D. Ill. Sept. 27, 2005) to be persuasive:

> [W]hen Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules. . . . By providing compensation to victims of computer fraud, the CFAA operates, in effect, like a tort action. As a result, the Court assumes that Congress drafted the CFAA with an intent to permit vicarious liability. . . . To hold otherwise would exempt a principal from liability when its agent improperly accessed a computer at the direction of the principal.

Like the court in *Carter*, this Court finds that Svanaco is not precluded from asserting a CFAA claim against MGI under a vicarious-liability theory.

However, even though Svanaco is not foreclosed from pursuing a vicarious-liability claim against MGI, no reasonable jury could find that with respect to the DDOS attacks, MGI was the principal and that Brand was MGI's agent. *See In re Aimster Copyright Litig.*, 334 F.3d 643, 654 (7th Cir. 2003) (explaining vicarious liability); *Teva Pharm. USA, Inc.*, 291 F. Supp. 3d at 671 (noting that a person may be liable under the CFAA if he directs, encourages, or induces someone else to access a computer). While Brand discussed with Gilman several of the actions

24

that he planned to take against Svanaco, such as publishing negative online reviews and websites and filing a complaint with the BBB, the record does not contain any evidence that Brand offered to launch a DDOS attack against Svanaco, much less that MGI or Gilman directed, encouraged, or induced Brand to do so. *See Teva Pharm.*, 291 F. Supp. 3d at 671. Therefore, the Court grants MGI's motion for summary judgment as to Count II.

## III. Defamation (Count III)

In Count III, Svanaco asserts a claim for defamation against Brand and MGI, based on the negative online content Brand published about Svanaco and its work. Under Illinois law,[10] defamation is "the publication of a false statement that 'tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person.'" *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009) (quoting *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006)). Generally, a plaintiff must prove that "the unprivileged communication of a false statement caused him harm," but Illinois also recognizes that some statements are "so obviously harmful that injury to the plaintiff's reputation can be presumed," otherwise known as *per se* defamation. *Id.* Illinois recognizes five categories of *per se* defamation, two of which are relevant here: (1) statements imputing an inability to perform or lack of integrity in one's duties of employment; and (2) statements imputing a lack of ability in one's profession. *Id.*

MGI first argues it is entitled to summary judgment because none of Brand's posts can be considered false statements; rather, they are opinions. The First Amendment protects expressions of opinion, which are not actionable as defamation *per se*. *See Gertz v. Robert Welch, Inc.*, 418

---

[10] Defamation is a state law tort claim. *See Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 707 (7th Cir. 1994). The parties do not dispute that Illinois law applies here.

U.S. 323, 339–40 (1974). But "a speaker cannot just couch a 'false assertion of fact' in 'terms of an opinion' and thereby evade liability." *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 287 F. Supp. 3d 726, 736 (N.D Ill. 2018) (quoting *Bryson v. News Am. Publ'ns., Inc.*, 672 N.E.2d 1207, 1220 (Ill. 1996)). Thus, a statement is only protected as an opinion if it "cannot be reasonably interpreted as stating actual fact." *Id.* (internal quotation marks omitted). Under Illinois law, courts evaluate several factors to determine whether a statement is an opinion or fact: "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement has a literary or social context that shows that is a factual assertion rather than an opinion." *Id.* (citing *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 840 (Ill. 2006)). Moreover, mixed expressions of opinion and fact are actionable. *Id.*

Here, several of Brand's statements comprise assertions of fact, not opinions. For example, Brand stated that Svanaco billed MGI "$34,000 for less than 6 hours of actual web services." How long Svanaco ***should*** have spent building the beta website may be an opinion, but how long Svanaco ***actually*** spent on it is a precise and verifiable statement of fact. In addition, Brand accused Svanaco of committing fraud and operating a scam, statements which qualify as defamation *per se*. *See Neuros Co., Ltd. v. KTurbo, Inc.*, 698 F.3d 514, 519 (7th Cir. 2012) (holding that accusation that company committed fraud against its customers constitutes defamation *per se*, as "[i]t's hard to imagine a more damaging accusation to make against a business"). And the Court is unconvinced by MGI's arguments that Brand's statements were

true, as a reasonable jury could find otherwise based on Svanaco's records showing it spent 720 hours working on MGI's website. (Pl.'s RSMF ¶ 4; Pl.'s RSMF Ex. D.)[11]

Further, the Court rejects MGI's argument that Svanaco is a public figure who must prove actual malice as part of its defamation claim. MGI's only support for this characterization is its accusation that Svanaco "trumpets its high-profile clientele (*e.g.*[,] Chicago Bears, NFL Hall of Fame) which necessarily raise a matter of public interest." (Def.'s MSJ at 24.) But MGI offers no legal authority for its assertion that merely performing a service for a famous client can transform a company into a public figure. To the contrary, the United States Supreme Court has instructed that "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, [a party] should not be deemed a public personality." *Gertz*, 418 U.S. at 352; *see also Harris v. Quadracci*, 48 F.3d 247, 250 (7th Cir. 1995) (defining public figure as "an individual [who] voluntarily injects himself or is drawn into a particular public controversy" (internal quotation marks omitted)). MGI has not provided clear evidence that Svanaco is famous or notorious among the general public, nor that Svanaco is involved in societal affairs or public controversy. Therefore, the Court finds that Svanaco is not a public figure for the purposes of its defamation claim.

Finally, MGI again argues that Svanaco may not assert a defamation claim against MGI, because it was Brand who posted the allegedly defamatory content. But it is well-established that a principal may be held vicariously liable for his agent's defamatory statements. *See, e.g.*, *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010); *Nelson v. Levy Home Entm't., LLC*, No. 10

---

[11] MGI argues Svanaco's records should be stricken because "no business records foundation has been provided." (MGI's MTS at 3.) However, as explained above, Svanaco could properly lay the foundation for admission of those records at trial. Therefore, the Court is not barred from considering such evidence at the summary judgment stage. *See Wheatley*, 826 F.3d at 420.

C 3954, 2012 WL 403974, at *11 (N.D. Ill. Feb. 8, 2012). To hold MGI liable for Brand's statements, Svanaco must show that Brand's statements were made "within the scope of [his] employment." *See Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 991 (Ill. 2007); *Nelson*, 2012 WL 403974, at *11. Even though Brand was not an official MGI employee, "[a] court's cardinal consideration in determining whether a person is an agent [for purposes of vicarious liability] or an independent contractor, is the right to control the manner of work performance, regardless of whether that right was actually exercised." *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 784 (N.D. Ill. 2012) (internal quotation marks omitted).

In this case, Svanaco has demonstrated that there is a disputed issue of material fact as to whether Brand was MGI's agent. Brand sent Gilman the link to one of his negative review websites and invited "comments/edits." (MGI's RSAF ¶ 11.) Gilman also reviewed one of Brand's posts and told him to include a title "something like 700 hours of AE done in 30 minutes using Word Press" to "intimidate" Svanaco, and reminded him that the goal of the review was to "intimidate" Svanaco. (Pl.'s RSMF ¶ 35). In addition, Svanaco has presented adequate evidence for a reasonable jury to believe that Brand was "authorized" to make the allegedly defamatory statements, that MGI "ratified" his conduct, and that Brand was "acting in furtherance of [MGI]'s business." *Miles v. WTMX Radio Network*, No. 1:02-CV-00427, 2002 WL 31103471, at *4 (N.D. Ill. Sept. 18, 2002). Specifically, Gilman asked Brand if Svanaco could be "shamed" into repaying his money, to which Brand responded with a link to the americaneaglereviews.com website that he created. (MGI's RSAF ¶¶ 9, 11.) Later, Gilman asked Brand whether the website had "gone live yet," and "why is it that American Eagle hasn't reached out to me if this is on the web?" (*Id.* ¶ 12.) Brand's conduct similarly demonstrates that he acted in furtherance of MGI's interests; for example, he drafted a letter that he suggested MGI send to Svanaco, which stated,

"My understanding is that squaring up with Gilman Gear as soon as possible, you may see my consultant's personal warning website taken offline . . . ." (Pl.'s RSMF ¶ 40.)

In sum, while MGI claims that it only hired Brand for the limited purpose of reviewing the beta website and opining how many hours it took to create, Svanaco's version of events— that MGI hired Brand to shame, intimidate, and defame Svanaco on the internet—finds sufficient support in the record. The Court thus denies MGI's motion for summary judgment as to Count III.

## IV.    Tortious Interference with Prospective Economic Advantage (Count IV)

In Count IV, Svanaco asserts a state law claim for tortious interference with prospective economic advantage, claiming that the negative online content that Brand posted online ruined its chances to do business with three companies: NiSource, Calico Cottage, and ID Systems. Under Illinois law, the elements of a tortious interference claim are: "'(1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.'" *Botvinick v. Rush Univ. Med. Ctr.*, 574 F.3d 414, 417 (7th Cir. 2009) (quoting *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991)). Additionally, proof of tortious interference with prospective economic advantage requires "a showing that the tortfeasor acted with actual malice . . . a desire to harm." *Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir. 1992) (applying Illinois law).

MGI argues that it is entitled to summary judgment as to Count IV because the undisputed evidence shows that Brand's posts did not influence the companies' decisions not to

work with Svanaco. As evidence, MGI has submitted affidavits from decisionmakers at Calico Cottage and ID Systems, which state that their respective companies chose not to work with Svanaco for unrelated reasons, such as geographic location, company size, and pricing. (MGI's SUMF Exs. 45–46.) However, Levin and Garten, the two companies' respective decisionmakers, also admit in their affidavits that they saw negative online reviews about Svanaco before officially deciding not to hire the company. Both Levin and Garten also confronted Svanaco about the reviews before making their decisions, with Garten even telling Svanaco that the reviews played a primary role. Svanaco has thus presented a genuine dispute of fact regarding the impact of Brand's reviews on Calico Cottage and ID Systems.

As to NiSource, the record is even less straightforward. At his deposition, NiSource representative Markiewicz testified that he felt "concerned" about the "negative information" he had read online about Svanaco, which made him "very concerned about building a relationship" with Svanaco. (Pl.'s RSMF Ex. Y.) That Markiewicz did not specifically remember seeing Brand's posts or any reviews mentioning MGI does not foreclose the possibility that those were the ones that he saw. While MGI points out that NiSource nonetheless invited Svanaco to submit a bid, a reasonable jury could find that Markiewicz still harbored doubts about hiring Svanaco. Moreover, Markiewicz testified that NiSource hired a different company instead of Svanaco after conducting "rankings and ratings" of the bidders based on criteria "across many different categories," but he did not indicate whether Svanaco's online reputation played a role in that analysis. (*Id.*) Therefore, Svanaco has similarly established a genuine dispute of fact about whether Brand's posts prevented Svanaco's legitimate business expectancy regarding NiSource from ripening into a valid business relationship.

MGI again argues that it cannot be held vicariously liable for Brand's tortious interference. But, as explained above, courts have not hesitated to hold principals vicariously liable for their agents' torts, including tortious interference with economic advantage. *See Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 913 (7th Cir. 1994) (applying Illinois law) (holding that principal may be liable for agent's tortious interference with employment relationship if agent was "acting in furtherance (however misguidedly) of his principal's business"). Here, a reasonable jury could conclude that Brand was acting in furtherance of MGI's business in causing Svanaco to lose out on a contract with NiSource. For example, Gilman told Brand that he wanted Svanaco to be "shamed" and "intimidated." (MGI's RSAF ¶¶ 9–12; Pl.'s RSMF ¶¶ 35–38.) Brand then asked Gilman to pay money to boost his negative review website to the top of search engine listings, presumably to scare away more of Svanaco's potential customers. In addition, Brand told Gilman that he expected Svanaco to suffer a loss of "$100k – 500k in the first 7–9 months" due to his online posts. (Pl.'s RSMF ¶ 43.) In light of this evidence, a reasonable jury could hold MGI vicariously liable for Brand's tortious interference. Therefore, MGI's motion for summary judgment as to Count IV is denied.

## V.     Conspiracy (Count VI)

In Count VI, Svanaco asserts that MGI and Brand were engaged in a civil conspiracy to defame Svanaco, tortiously interfere with its prospective economic advantage, and otherwise force it to pay or provide services to MGI.[12] To succeed in a claim of civil conspiracy under Illinois law, Svanaco must establish: "(1) an agreement between [MGI and Brand] for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means;

---

[12] Svanaco does not claim that MGI and Brand conspired to violate the ACPA or CFAA. (*See* Am. Compl. ¶¶ 58–61, Dkt. No. 46.)

and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to [Svanaco]." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citing *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999)). Civil conspiracy is not an independent tort; rather, there must be an independent cause of action underlying the conspiracy claim. *See Thomas v. Fuerst*, 803 N.E.2d 619, 625–26 (Ill. App. Ct. 2004). Because the Court has denied MGI's motion for summary judgment as to Counts III (defamation) and IV (tortious interference with prospective economic advantage), the Court now addresses whether Svanaco has adequately established the existence of a conspiracy between MGI and Brand to commit those torts.

MGI first argues that even if it had a conspiratorial agreement with Brand, Svanaco's conspiracy claim must fail because it is duplicative of the vicarious-liability theories. But a plaintiff may assert both a claim for vicarious liability and one for civil conspiracy, as the two theories have different elements of proof. *See, e.g.*, *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (noting that the plaintiff pursued vicarious liability and civil conspiracy in the same action but not expressly endorsing that approach); *Simon v. Nw. Univ.*, 175 F. Supp. 3d 973, 987 (N.D. Ill. 2016). To prove a civil conspiracy, a plaintiff must show "a combination of two or more persons," but "because the acts of an agent are considered in law to be the acts of the principal, there can be no conspiracy between a principal and an agent." *Buckner v. Atl. Plant Maintenance, Inc.*, 694 N.E.2d 565, 602 (Ill. 1998); *see, e.g.*, *Gaudie v. Countrywide Home Loans, Inc.*, 683 F. Supp. 2d 750, 760 (N.D. Ill. 2010) ("If plaintiff is able to prove an agency relationship at [the summary judgment] stage, then her civil conspiracy claim cannot stand."). On the other hand, a plaintiff proceeding under a vicarious-liability theory must prove the existence of an agency relationship. *See In re Aimster*, 334 F.3d at 654. Similarly,

vicarious liability may exist where an employee or agent acted in the scope of his duties or on the employer or principal's behalf, even if no prior agreement existed. *See Doe v. City of Chicago*, 360 F.3d 667, 670 (7th Cir. 2004) (applying Illinois law); *Weller v. Paramedic Servs. of Ill., Inc.*, 297 F. Supp. 3d 836, 848–49 (N.D. Ill. 2018). An agreement between two parties is a "necessary and important element" of a civil conspiracy. *Borsellino*, 477 F.3d at 509 (internal quotation marks omitted). Therefore, Svanaco's conspiracy claim is not duplicative of its other claims.

Second, MGI argues that Svanaco has not presented any evidence of an agreement, other than Brand's agreement to review the beta website in exchange for $900 from MGI. But the record contains conversations between MGI and Brand that suggest an agreement to defame or tortiously interfere with Svanaco's business prospects. For example, when Neil Gilman asked Brand if it was possible to "shame" Svanaco into returning his money, Brand answered "yes" and sent Gilman a link to a negative review website that he had created and invited Gilman to make comments and edits. (Pl.'s RSMF ¶ 34.) Gilman later asked Brand for an update on the website's status and expressed his expectation that Svanaco would contact him after seeing it. (MGI's RSAF ¶ 12.) Similarly, after learning that Brand had posted negative content about Svanaco online, Gilman asked Brand, "Is now the time to contact them and ask them to refund our money?" (Pl.'s RSMF ¶ 43.) Gilman also reviewed some of the content that Brand posted and provided feedback, indicating that he wanted Svanaco to "feel intimidated by this review." (*Id.* ¶ 38.) Gilman also told Brand that he expected that his online posts would cause Svanaco to suffer losses of "$100k – 500k in the first 7–9 months" by deterring potential customers. (*Id.* ¶ 43.)

In addition, after Svanaco's counsel Reda contacted Gilman about Brand's posts, Gilman promptly informed Brand. (*Id.* ¶ 62) Brand then drafted a three-point response letter for Gilman,

which he claimed would ensure that "nothing goes outside of plan." (MGI's RSAF ¶ 18.) In response, Gilman agreed to send Brand "any communication before it is sent to AE" and assured Brand that he would "not answer any question[s] about you." (*Id.*) Thereafter, Gilman followed Brand's advice about how to respond to Reda, sending an email that included two of the three points suggested by Brand. (*Id.* ¶ 19.) Arguably, Gilman intentionally misled Reda in his reply email, claiming that he did not know anything about the websites and YouTube videos referenced in Reda's letter, even though Reda's letter had prompted him to reach out to Brand. (*Id.*) In addition, Gilman asked Brand to respond to a different communication from Reda, and Brand replied saying he had done so. (*Id.* ¶ 20.) Finally, on December 19, 2015, Gilman asked Brand to send Reda a statement to the effect that MGI was not involved in the online posts and websites to "protect" Gilman and MGI from Reda and Svanaco. (*Id.* ¶ 21.) Based on the extensive communications and coordination between Gilman and Brand, a reasonable jury could find they had an agreement to engage in unlawful activity.[13]

Finally, MGI points out that as early as November 28, 2015, it instructed Brand to stop his activity targeting Svanaco and remove the negative online posts. However, this purported "extinguish[ment]" of the conspiracy affects only the damages to which Svanaco is entitled; it does not affect MGI's liability for the conspiracy up to that point. *See, e.g.*, *United States ex rel.*

---

[13] MGI also points out that it only paid Brand $900, which suggests that all the steps he took to attack Svanaco online could not have been at its behest. However, MGI has not carried its burden of proving this contention as a matter of law; put differently, a reasonable jury could disagree with MGI and find that $900 was adequate compensation. In addition, the record contains evidence suggesting that Brand spent time and effort registering websites and posting negative reviews about Svanaco to persuade MGI to hire him to build their website. For example, in January 2016, Gilman told Brand that he could submit a proposal to build a new e-commerce website for MGI. (MGI's RSAF ¶ 24.) Brand then sent an email to Parker later that month stating, "I finished the side project months ago as agreed so that we could return to the reason I interviewed, to have a website proposal considered." (*Id.* ¶ 28.) Accordingly, a reasonable jury could find that Brand conspired with MGI with the hopes of earning MGI's future business.

*McGee v. IBM Corp.*, No. 11-C-3482, 2017 WL 4467458, at *3–4 (N.D. Ill. Oct. 6, 2017) (granting summary judgment to defendant only for time period after its withdrawal from conspiracy). Based on the record, a jury could find that prior to November 28, 2015, Brand had already committed at least one overt act in furtherance of the conspiratorial agreement. *See Balfour v. Kline*, No. 83 C 661, 1987 WL 6865, at *5 n.2 (N.D. Ill. Feb. 11, 1987) ("To escape liability, [defendant] would have had to withdraw from the conspiracy before any overt act was taken in furtherance of the conspiratorial agreement." (citing *United States v. Read*, 658 F.2d 1225, 1232 (7th Cir. 1981)). Therefore, MGI's argument that it withdrew from any conspiracy with Brand in November 2015 does not entitle it to summary judgment as to Count VI.

MGI's motion for summary judgment as to Count VI is thus denied. Svanaco's civil conspiracy claim may proceed to the extent that it is based on MGI and Brand's conspiracy to defame Svanaco and interfere with its prospective economic advantage.

## VI. Breach of Contract (Count VII and MGI's Counterclaim)

Finally, the parties have cross-moved for summary judgment on their respective breach of contract claims. Under Illinois law, a breach of contract claim has four elements: "(1) the existence of a valid and enforceable contract; (2) substantial performance by [the claimant]; (3) a breach by [the other party]; and (4) resultant damages." *Dual-Temp of Ill., Inc. v. Hench Control, Inc.*, 821 F.3d 866, 869 (7th Cir. 2016) (applying Illinois law); *see also Burkhart v. Wolf Motors of Naperville, Inc. ex rel. Toyota of Naperville*, 61 N.E.3d 1155, 1159 (Ill. App. Ct. 2016).

Svanaco claims MGI breached the Agreement by failing to provide the product import information necessary for Svanaco to complete the website. Svanaco's "Statement of Work," which was acknowledged and signed by Gilman on March 12, 2013, stated that product import information was a "client deliverable," and MGI was required "to provide [a] product import

spreadsheet containing all pertinent information about your products." (Pl./CounterDefendant's St. of Mat. Facts ("Pl.'s SMF") ¶ 16, Dkt. No. 193; Pl.'s SMF Ex. E.) MGI does not dispute that it failed to provide the product information, even though it knew the information was essential to the final launch of the website. ( MGI's RSMF ¶¶ 29–31.) While MGI argues that it never refused to provide the information and simply needed more time, "[i]t is a basic tenet of contract law, recognized in Illinois, that where no time for performance is specified, the law implies a reasonable time." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 690 (7th Cir. 2011). The record illustrates MGI knew by at least March 12, 2013 of its responsibility to provide the product import information, but it failed to do so for over a year. (MGI's RSMF ¶¶ 22–29.) Therefore, a reasonable jury could find that MGI's delay was unreasonable and constituted a breach.

Svanaco also claims MGI breached the Agreement by failing to make the third and final payment. However, the pricing section of the Agreement states that MGI was not required to make the final payment until the "launch of site," and the MGI website was never launched. Therefore, MGI did not breach by refusing to make that payment.[14] Thus, MGI's motion for summary judgment as to Count IV is granted to the extent that it is based on its failure to make the final payment to Svanaco but denied as to its failure to provide the product import information.

In its counterclaim, MGI alleges Svanaco breached the Agreement in multiple ways: refusing to complete the website unless MGI prepaid a portion of the final payment, removing MGI's access to the beta website, and refusing to spend 55 hours assisting MGI with the data-

---

[14] In so holding, the Court leaves open the possibility that MGI breached the agreement by failing to provide the product import information necessary for Svanaco to complete the website. To be clear, Svanaco's breach of contract claim survives to the extent it is based on that conduct as opposed to MGI's failure to make the third payment.

import process as promised. Svanaco, for its part, argues it is entitled to summary judgment on MGI's breach of contract counterclaim because at the time of these alleged breaches, MGI had already breached the contract by failing to provide the product import information.

It is correct that under Illinois contract law, "plaintiffs cannot succeed on a breach of contract claim unless they demonstrate their own performance of the contract's requirements." *Catalan*, 629 F.3d at 691. But Svanaco disregards the possibility that a reasonable jury could find MGI's delay in providing the product import information to be reasonable and therefore not a breach. In that case, MGI would not be foreclosed from asserting a breach of contract claim against Svanaco for conduct that occurred after that point. *See id.* ("On these facts, which party breached first is not a question with a clear answer."); *see, e.g.*, *In re Sage Enterp., Inc.*, No. 04 B 05548, 2008 WL 5645057, at *1 (Bankr. N.D. Ill. Nov. 25, 2008) (denying summary judgment where there is a genuine dispute of material fact regarding which party breached first). After all, as discussed above, the contract provided that MGI's third payment was not due until the launch of the website, so a reasonable jury could find that Svanaco's request that MGI pay half of that payment prior to the website's launch constituted a breach. Similarly, a reasonable jury could find that Svanaco breached the Agreement by removing MGI's access to the beta website or refusing to continue work on the project. The parties also dispute whether Svanaco spent 55 hours assisting MGI with the product import—with Svanaco claiming it did so and MGI claiming Svanaco spent only 6.5 hours on the task—but a reasonable jury could find in either party's favor. Ultimately, the record contains evidence supporting both Svanaco's and MGI's allegations that the other party breached the Agreement. Therefore, Svanaco's motion for summary judgment on MGI's breach of contract counterclaim is denied as well.

**CONCLUSION**

For the foregoing reasons, MGI's motion for summary judgment is granted as to Counts I and II and denied as to Counts III, IV, VI, and VII. Svanaco's motion for summary judgment as to MGI's counterclaim is denied.[15]

ENTERED:

Dated: September 30, 2019

_____
Andrea R. Wood
United States District Judge

---

[15] Also before the Court is MGI's motion to strike several of Svanaco's summary judgment exhibits (Dkt. No. 221). As explained above, MGI's motion to strike McElrath's expert report and Svanaco's time records is denied because MGI objected only to the *form* of those exhibits, as opposed to their substantive admissibility. The remaining portions of MGI's motion to strike are denied as moot, as the Court did not rely on the challenged exhibits in ruling on the parties' cross-motions for summary judgment.